## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: MCKINSEY & CO., INC. NATIONAL PRESCRIPTION OPIATE CONSULTANT LITIGATION | MDL No. 2966 |
| This document relates to: | Master Docket No.: 3:21-MD-02966-CRB |
| CONFEDERATED TRIBES OF THE GRAND RONDE COMMUNITY OF OREGON, | Hon. Judge Charles R. Breyer |
| PLAINTIFF, | Case No.: |
| v. | |
| MCKINSEY & COMPANY INC., | |
| DEFENDANT. | JURY TRIAL DEMANDED |
| | COMPLAINT |

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

PARTIES .......................................................................................................... 6

    I.      Plaintiff ............................................................................................... 6

    II.     Defendant .......................................................................................... 8

    III.    Purdue Co-Conspirators ..................................................................... 8

JURISDICTION AND VENUE ........................................................................... 9

FACTUAL BACKGROUND ............................................................................... 10

    I.      PRESCRIPTION OPIOIDS ARE HIGHLY DANGEROUS .............................. 10

    II.     MCKINSEY CREATED AND EXECUTED A SCHEME TO HELP
         OPIOID MANUFACTURERS TURBOCHARGE THE SALE OF
         OPIOID PRODUCTS ................................................................................ 11

         A.     The Corporate Integrity Agreement ........................................... 11

         B.     McKinsey's Role Following the Corporate Integrity Agreement ............. 11

         C.     McKinsey Supplied Purdue With Granular Sales and Marketing
              Strategies and Remained Intimately Involved in Implementation ........... 12

         D.     Project Turbocharge ................................................................... 16

         E.     McKinsey Knew About Dangers of Opioids and Acted to Maximize
              OxyContin Prescriptions Anyway ............................................... 24

          F.     Purdue's 2020 Guilty Plea and McKinsey's Recent Statement ............... 25

    III.    FACTUAL ALLEGATIONS PERTAINING TO CLAIMS UNDER
         THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS
         ACT ("RICO") .................................................................................... 26

         A.     The Common Purpose and Scheme of the Opioid Marketing
              Enterprise .................................................................................. 26

         B.     The Conduct of the Opioid Marketing Enterprise Violated
              Civil RICO ................................................................................ 29

          C.     Pattern of Racketeering Activity ................................................ 30

IV.    MCKINSEY'S MISCONDUCT HAS INJURED AND CONTINUES TO INJURE THE TRIBE AND ITS CITIZENS ........................................................ 34

CLAIMS FOR RELIEF ........................................................................................... 37

    Count I – RICO 18 U.S.C. § 1962(C) .................................................. 37

    Count II – RICO 18 U.S.C. § 1962(D) ................................................ 45

    Count III – RICO 18 U.S.C. § 1962(A) ............................................... 45

    Count IV – RICO 18 U.S.C. § 1962(B) ............................................... 46

    Count V – Public Nuisance .................................................................. 46

    Count VI – Negligence and Negligence Per Se ................................... 51

    Count VII – Violation of Oregon Unlawful Trade Practices Act (O.R.S. §§ 646.605 to 656) .................................................................. 53

    Count VIII – Civil Conspiracy .............................................................. 55

    Count IX – Unjust Enrichment .............................................................. 57

PRAYER FOR RELIEF ......................................................................................... 58

JURY DEMAND ................................................................................................... 60

Plaintiff the Confederated Tribes of the Grand Ronde Community of Oregon ("Plaintiff" or "Tribe"), brings this Complaint for compensatory, punitive, and other damages, and restitution, disgorgement, and civil penalties.

## INTRODUCTION

1.      Prescription opioids, which include both name-brand prescription opioids and their generic equivalents, are powerful pain-reducing medications.  When used properly, they can help manage pain for certain patients.  But, even then, these drugs can cause addiction, overdose, and death.  When used to treat chronic pain, or when used for non-medical purposes, those risks are amplified.  In recent years, opioid use for both chronic pain and non-medical purposes has grown dramatically, resulting in an epidemic of abuse.  Nationwide, millions of Americans are addicted to prescription opioids, and tens of thousands die annually from opioid overdoses.

2.      This case arises from the worst man-made epidemic in modern medical history— the misuse, abuse, and over-prescription of opioids.  This crisis arose from the opioid manufacturers' deliberately deceptive marketing strategy to expand opioid use.

3.      McKinsey & Company Inc. ("McKinsey" or "Defendant") played an integral role in creating and deepening the opioid crisis.

4.      The aggressive marketing campaign engineered by McKinsey to "turbocharge" opioid sales enabled the opioid manufacturers, distributors, and retailers to overcome the longstanding medical consensus that opioids were unsafe for the treatment of chronic pain, and

between 1999 and 2016, the number of opioids prescribed nationwide quadrupled,[1] as did deaths from prescription opioids.[2]

5.      McKinsey coordinated activities across a wide range of industry actors, helping to ensure that companies operating in the opioid sector had a steady stream of revenues despite the evidence of addiction and death caused by these products.

6.      McKinsey worked with Purdue Pharma and Johnson & Johnson as well as an array of manufacturers, distributors, retailers, and investors to "turbocharge" the sales of these deadly drugs.

7.      In June 2009, McKinsey began working with Purdue Pharma to increase sales of Purdue's opioids products.  McKinsey created a specific sales and marketing strategy based on McKinsey's own independent research and unique methodologies.  Purdue adopted the strategy and executed it with McKinsey's assistance.

8.      In 2013, Purdue implemented, with McKinsey's ongoing assistance, "Project Turbocharge," a marketing strategy to increase opioids sales by hundreds of millions of dollars annually.  With McKinsey's assistance, Purdue trained its sales representatives to operate pursuant to McKinsey's strategy for selling OxyContin.

9.      The 2007 guilty plea by Purdue Pharma, and its attendant restrictions on operations, should have resulted in fewer overall sales of OxyContin.  Concurrent with the guilty

---

[1] Li Hui Chen et al., *Drug-Poisoning Deaths Involving Opioid Analgesics:  United States, 1999–2011*, 166 Nat'l Ctr. for Health Statistics Data Brief (Sept. 2014), https://www.cdc.gov/nchs/data/databriefs/db166.pdf; Rose A. Rudd et al., *Increases in Drug and Opioid-Involved Overdose Deaths—United States, 2010–2015*, 65 Morbidity and Mortality Weekly Report 1445 (Dec. 30, 2016), https://www.cdc.gov/mmwr/volumes/65/wr/mm655051e1.htm.
[2] Anna Lembke, *Drug Dealer MD: How Doctors Were Duped, Patients Got Hooked, and Why It's Hard to Stop* 4 (2016).

plea, Purdue entered into a Corporate Integrity Agreement with the Office of the Inspector General of the United States Department of Health and Human Services on May 7, 2007.  Within five years of the plea, when the Corporate Integrity Agreement expired on May 10, 2012, however, OxyContin sales would triple because of McKinsey's sales and marketing strategy which Purdue spent hundreds of millions of dollars implementing.

10.     The increase in opioid prescriptions to treat chronic pain in turn led to a massive increase in the number of people seeking prescription opioids for non-medical uses and becoming addicted.  Nationally, the number of people who take prescription opioids for non-medical purposes is now greater than the number of people who use cocaine, heroin, hallucinogens, and inhalants combined.[3]

11.     American Indians, including the Tribe and its citizens, have been significantly impacted by this epidemic.  American Indians suffer the highest per capita rate of opioid overdoses.[4]

12.     Hundreds of American Indians have died of opioid overdoses in recent years.

13.     And for every opioid overdose death, it is estimated that there are 10 treatment admissions for abuse, 32 emergency room visits, 130 people who are addicted to opioids, and 825 non-medical users of opioids.[5]

---

[3] Substance Abuse and Mental Health Servs. Admin., *Results from the 2009 National Survey on Drug Use and Health: Volume I. Summary of National Findings*, NSDUH Series H-38A, HHS Publication No. SMA 10-4586 Findings (2010).
[4] National Congress of American Indians Policy Research Center, *Reflecting on a Crisis Curbing Opioid Abuse in Communities* (Oct. 2016), https://www.ncai.org/policy-research-center/research-data/prc-publications/PRCResearchUpdate_Annual2016.pdf.
[5] Jennifer DuPuis, *The Opioid Crisis in Indian Country*, at 37, https://www.nihb.org/docs/06162016/Opioid%20Crisis%20Part%20in%20Indian%20Country.pdf (last visited Feb. 5, 2018); Gery P. Guy, Jr. et al., *Emergency Department Visits Involving Opioid Overdoses, U.S., 2010–2014*, 54 Am. J. of Preventive Medicine (Jan. 2018), http://www.ajpmonline.org/article/S0749-3797(17)30494-4/fulltext.

14.     American Indians have high rates of prescription pain reliever misuse.  It is estimated that 5.8% of the total American Indian population suffers from such misuse, including 42,000 abusing prescription Hydrocodone, 34,000 abusing prescription Oxycodone, and 1,000 abusing prescription Fentanyl.[6]

15.     The impact on American Indian children is particularly devastating.  The CDC has reported that approximately one out of every 14.5 American Indian youths aged 12 or older used prescription opioids for non-medical purposes in 2012.  This is 60% higher than the rate for white youths.  Similarly, it has been reported that by twelfth grade, nearly 13% of American Indian teens have used OxyContin, an opioid manufactured by conspiracy member Purdue.[7]  The fact that American Indian teens are easily able to obtain OxyContin at these alarming rates indicates the degree to which drug diversion has created an illegal secondary market for opioids.

16.     The opioid epidemic resulting from McKinsey and its co-conspirators' conduct has injured even the youngest members of Indian tribes.  In 1992, in the United States, only 2% of pregnant women admitted for drug treatment services abused opioids.  By 2012, opioids accounted for 38% of all drug treatment admissions of pregnant women.[8]  Many Tribal women have become addicted to prescription opioids and have used these drugs during their pregnancies.  As a result, many Tribal infants suffer from opioid withdrawal and Neonatal

---

[6] Substance Abuse and Mental Health Services Admin., U.S. Dept. of Health and Human Services, *2018 National Survey on Drug Use and Health:  American Indians and Alaska Natives (AI/Ans)*, p. 13 (2018).
[7] Linda R. Stanley, *Rates of Substance Use of American Indian Students in 8th, 10th, and 12th Grades Living on or Near Reservations: Update, 2009–2012*, Pub. Health Rep. (Mar.–Apr. 2014), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3904895/table/T1/.
[8] Naana Afua Jumah, *Rural, Pregnant, and Opioid Dependent: A Systematic Review*, 10 Substance Abuse 35 (2016), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4915786/.

Abstinence Syndrome ("NAS"), which can have adverse short- and long-term developmental consequences.[9]

17.     Pregnant American Indian women are up to 8.7 times more likely than pregnant women from other groups to be diagnosed with opioid dependency or abuse, and in some communities more than one in 10 pregnant American Indian women have a diagnosis of opioid dependency or abuse.[10]

18.     Prescription opioid diversion on and around the Tribe's reservation and communities contributes to a range of social problems.  Adverse impacts on the Tribe's families include child abuse and neglect, and family dysfunction.  The Tribe's children are regularly removed from their families because of prescription opioid dependency and abuse by both children and parents.  These removals harm the Tribe's children and families, and they harm the Tribe itself, particularly when children are placed with families outside of the Tribe.

19.     Other social problems caused by the opioid epidemic include criminal behavior, poverty, property damage, unemployment, and social despair.  As a result of these adverse social outcomes, more and more of the Tribe's resources are devoted to addiction-related problems, leaving a diminished pool of resources available for education, cultural preservation, and social programs.  Meanwhile, the opioid crisis diminishes the Tribe's available workforce, decreases productivity, increases poverty, and consequently requires greater expenditures for governmental assistance.

---

[9] Jean Y. Ko et al., *CDC Grand Rounds: Public Health Strategies to Prevent Neonatal Abstinence Syndrome*, 66 Morbidity and Mortality Weekly Report 242 (Mar. 10, 2017), https://www.cdc.gov/mmwr/volumes/66/wr/pdfs/mm6609a2.pdf.
[10] DuPuis, *supra* note 5, at 64.

20.     Damages suffered by the Tribe include the costs of (a) medical care, therapeutic

and prescription drugs, and other treatments for patients suffering from opioid-related addiction,

overdoses, or disease; (b) law enforcement and public safety measures necessitated by the opioid

crisis; (c) opioid-related counseling and rehabilitation services; (d) welfare for children whose

parents suffer from opioid-related disease or incapacitation; (e) increased crime, property

damage, and public blight caused by opioids; (f) lost productivity of its citizens and businesses;

and (g) the costs to abate and remediate the public health crisis caused by McKinsey and its co-

conspirators.

21.     The Tribe seeks:  (a) injunctive relief; (b) compensatory damages; (c) punitive

damages; (d) restitution; (e) disgorgement of all amounts unjustly obtained by McKinsey;

(f) abatement and remediation costs; (g) attorney's fees and costs; and (h) such relief as justice

may require.

## PARTIES

### I.     PLAINTIFF

22.     The Confederated Tribes of the Grand Ronde Community of Oregon is a

federally-recognized Indian tribe with over 5,500 enrolled citizens.  The Tribe's Reservation is

located in southwestern Yamhill and northwestern Polk County, Oregon, approximately 25 miles

from the Oregon Coast.

23.     The Tribe provides healthcare and related services to its citizens and to other

American Indians and Alaska Natives within its service area, pursuant to a compact under Title

V of the Indian Self Determination and Education Assistance Act, 25 U.S.C. §§ 5301–5423, as

well as federally and tribally-funded programs for housing assistance, job training and assistance,

a robust child welfare and protection network to intervene with families that have been torn apart

by opioid abuse, and many other services to assist its citizens and members of the community to fight the opioid abuse and to assist in recovery.

24.     The Tribe has experienced the devastating effect of the opioid epidemic on the children, families, and communities of its citizens and the area on and around its Reservation. The Tribe is expending increasing amounts of resources on healthcare for opioid-related conditions, the treatment of opioid dependence, prevention services, custodial services for children with opioid-addicted parents and other social services, as well as police and public safety resources related to the opioid epidemic.  In 2017 alone, the Tribe spent more than $400,000 just on opioid treatment services—not including costs of all outpatient care or related services.  The number of child welfare interventions due to opioid dependence and the housing instability and criminal activity which often follows opioid misuse has grown exponentially, and the Tribe's social and educational services become even more taxed when overdoses include the Tribe's citizens who are parents.  The severity of the opioid epidemic on and around the Tribe's Reservation has caused the Tribe to supply its tribal police with Narcan, an opioid-blocking agent, and those police have administered it to reverse overdoses in the Tribe's community.

25.     These are just some of the ways in which the Tribe has been forced to expend significant resources to combat the opioid epidemic and its effects, including, but not limited to, expenditures on social services, child welfare, law enforcement, and healthcare.

26.     The Tribe, by and through counsel including Rob Greene, Tribal Attorney for the Confederated Tribes of the Grand Ronde Community of Oregon, brings this action in its proprietary capacity and under its *parens patriae* authority in the public interest to protect the health, safety, and welfare of the Tribe's citizens to stop the prescription opioid epidemic on and around the Tribe's Reservation, and to recover damages and seek other redress from harm caused

by McKinsey's role in the improper marketing, sales, distribution, dispensing, and reporting practices related to prescription opioids.

## II.     DEFENDANT

27.     Defendant McKinsey & Company Inc. is a corporation organized under the laws of the state of New York.  McKinsey's principal place of business is located at 711 Third Avenue, New York, NY 10017.

28.     McKinsey is one of the world's largest consulting companies.  Its partners work worldwide for corporations and governments across diverse industries, including Purdue and other opioids manufacturers.

## III.    PURDUE CO-CONSPIRATORS

29.     Purdue Pharma L.P. (together with Purdue Pharma Inc. and The Purdue Frederick Company, "Purdue") is a Delaware business entity with its principal place of business in Connecticut.  At all relevant times, Purdue Pharma L.P. has manufactured and distributed substantial amounts of prescription opioids that have been and continue to be sold nationwide, including in Oregon, where the Tribe is located.

30.     Purdue Pharma Inc. (together with Purdue Pharma L.P. and The Purdue Frederick Company, "Purdue") is a New York business entity with its principal place of business in Connecticut.  At all relevant times, Purdue Pharma Inc. has manufactured and distributed substantial amounts of prescription opioids that have been and continue to be sold nationwide, including in Oregon, where the Tribe is located.

31.     The Purdue Frederick Company ("Purdue Frederick") (together with Purdue Pharma L.P. and Purdue Pharma Inc., "Purdue") is a Delaware business entity with its principal place of business in Connecticut.  At all relevant times, The Purdue Frederick Company has

manufactured and distributed substantial amounts of prescription opioids that have been and

continue to be sold nationwide, including in Oregon, where the Tribe is located.

## JURISDICTION AND VENUE

32.     This Court has subject matter jurisdiction over this action because the Tribe

brings a federal cause of action that raises a federal question pursuant to 28 U.S.C. § 1331, and

under 28 U.S.C. § 1362 because this action is brought by an Indian tribe.  The Court also has

supplemental jurisdiction over the Tribe's state law claims pursuant to 28 U.S.C. § 1367 because

the state law claims are part of the same case or controversy.

33.     This Court has personal jurisdiction over McKinsey because at all relevant times,

McKinsey purposely availed itself of the privilege of doing business in the State of California

and in this District, including by engaging in the business of researching, designing, and

implementing marketing and promoting strategies for various opioid manufacturers, including

Purdue, in support of their sales and marketing of opioids in Oregon.

34.     The Court also has personal jurisdiction over McKinsey under 18 U.S.C.

§ 1965(b) of the Racketeer Influenced and Corrupt Organizations Act as well as under a

conspiracy theory of jurisdiction since McKinsey's co-conspirators distributed and sold various

opioid products in California.  Venue is proper in the United States District Court for the

Northern District of California under 28 U.S.C. § 1391(g) and 18 U.S.C. § 1965.  The Tribe

hereby asserts that, but for the Multidistrict Litigation located in this District, the Tribe would

have filed its case in the United States District Court for the District of Oregon because a

substantial part of the events or omissions giving rise to this action occurred in Oregon and

because the Defendant is subject to the jurisdiction of the United States District Court for the

District of Oregon.

## FACTUAL BACKGROUND

### I.   PRESCRIPTION OPIOIDS ARE HIGHLY DANGEROUS

35.     Prescription opioids are powerful pain-reducing medications that include non-synthetic, partially synthetic, and fully synthetic derivatives of the opium poppy.  While these drugs can have benefits when used properly, they also pose serious risks.  They present "substantially increase[d]" risk when used to treat chronic pain and "can cause serious harm, including addiction, overdose and death" when "misused or abused."

36.     Given these risks, the marketing, distribution, and sale of prescription opioids are heavily regulated by federal law, including the Federal Controlled Substances Act ("FCSA"), 21 U.S.C. §§ 801 *et seq*., and the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S. §§ 321 *et seq*.  Similarly, numerous state regulations, including numerous professional regulations related to persons who handle, prescribe, and dispense controlled substances, impose strict controls and requirements throughout the prescription opioid distribution chain.

37.     As discussed below, despite the dangers of prescription opioids, opioid manufacturers, assisted by McKinsey, wrongfully marketed them through misleading statements that minimized the risks of these drugs and failed to disclose accurately the true magnitude of those risks.  The actions of McKinsey and the opioid manufacturers created a huge market for prescription opioids, which in turn led to massive diversion of these drugs from legitimate to illegitimate channels.  McKinsey and the opioid manufacturers as a group also concealed their wrongdoing from the public and the Tribe.  As a result of all McKinsey's wrongful acts, the Tribe and its citizens have suffered injuries and damages.

II.    **MCKINSEY CREATED AND EXECUTED A SCHEME TO HELP OPIOID MANUFACTURERS TURBOCHARGE THE SALE OF OPIOID PRODUCTS**

A.    **The Corporate Integrity Agreement**

38.    In May of 2007, The Purdue Frederick Company, the parent company of Purdue Pharma L.P., pleaded guilty to charges for misleading regulators, doctors, and the public regarding Purdue's opioid OxyContin.  In pleading guilty, Purdue admitted to falsely marketing OxyContin as a less addictive, safer alternative to other pain medications.

39.    In the global settlement resolution, Purdue and its parent company paid over $600 million and entered into a Corporate Integrity Agreement with the U.S. Department of Health and Human Services Office of Inspector General.

40.    Under the Corporate Integrity Agreement, for five years, Purdue was required to refrain from making any deceptive or misleading claims about OxyContin and was obligated to submit regular compliance reports regarding its sales and marketing practices.  Purdue was also required to monitor, report, and attempt to prevent inappropriate prescribing practices.

B.    **McKinsey's Role Following the Corporate Integrity Agreement**

41.    The Sackler family is among the richest families in the United States.  Members of the Sackler family have always controlled Purdue in the time periods relevant to this Complaint.

42.    Following the guilty plea, the Sacklers sought to insulate themselves from the risk they perceived in Purdue.  Email threads between the Sacklers in early 2008 indicate that the Sacklers had become concerned about personal liability regarding opioid-related misconduct.

43.    The Sacklers considered selling Purdue or merging with another pharmaceutical company as an option for limiting their risk.  Mortimer Sackler Jr. advocated for a sale or merger in a February 21, 2008 email to Dr. Richard Sackler (a former president and co-chairman of

11

Purdue) and several others, writing "[t]he pharmaceutical industry has become far too volatile and risky for a family to hold 95% of its wealth in.  It simply is not prudent for us to stay in the business given the future risks we are sure to face and the impact they will have on the shareholder value of the business and hence the family's wealth."  The risk he referred to was, at least in significant part, further liability related to misconduct in the marketing and sale of OxyContin.

44.     Alternatively, the Sacklers considered extracting as much wealth as possible from Purdue through distributions to themselves as shareholders.  Such distributions would allow the Sacklers to diversify their assets and make their wealth less vulnerable to judgments regarding Purdue's sales and marketing of opioids, including OxyContin.

45.     Either option—a sale or significant distributions to shareholders—would require Purdue to increase profitability in the short term.  Purdue turned to McKinsey, with which it had an existing business relationship, for help maximizing sales of OxyContin given the requirements of the Corporate Integrity Agreement and the scrutiny that came along with it.

**C.     McKinsey Supplied Purdue With Granular Sales and Marketing Strategies and Remained Intimately Involved in Implementation**

46.     McKinsey touts its model of engaging in transformational partnerships with its clients.  Rather than giving one-off advice, McKinsey learns each client's business intimately and provides tailored, granular strategies.

47.     McKinsey had begun collaborating with Purdue by June 2009.  McKinsey was tasked with increasing OxyContin sales despite the Corporate Integrity Agreement, which required, among other things, that Purdue comport with FDA requirements and included increased review and reporting obligations.

48.     McKinsey partners participated as part of an Executive Oversight Team and Project Management Office, reporting to Purdue's Executive Committee, the Purdue board, and with the Sackler family members, individually.  McKinsey worked side by side with Purdue and helped Purdue plan and implement Project Turbocharge, later called Evolve to Excellence ("E2E").  McKinsey assisted with sales representative training, productivity, messaging, and call plans, IT systems, promotional strategies, and market forecasting.

49.     McKinsey staffed at least thirty-six known consultants to Purdue, from senior partners down to entry-level associates.

50.     McKinsey provided sales and marketing strategies designed to sell as much OxyContin as possible, at one point in 2010 telling Purdue that the new strategies McKinsey had developed could generate as much as $400 million in additional annual sales.  McKinsey worked with Purdue to implement the strategies, with McKinsey's ongoing and extensive involvement.

51.     OxyContin sales grew dramatically, and the Sacklers diverted the resulting profits into other holdings.

52.     In a 2009 report, among other sales strategies, McKinsey advised Purdue sales representatives to push the highest dosages of OxyContin, which were the most profitable for Purdue.  To maximize dosages and improve targeting of the coordinated marketing strategy, McKinsey investigated the prescribing habits of individual physicians.

53.     At the Purdue board meeting in November 2009, Kathe and Richard Sackler asked staff to "identify specific programs that Sales and Marketing will implement to profitably grow the OER [extended-release oxycodone] market and OxyContin in light of competition; provide analytics around why/how the proposed increase in share-of-voice translates into sales and profitability growth; clarify the situation with respect to OxyContin being used by 35% of

new patients, but only retaining 30% of ongoing patients;" and give the Sacklers a copy of a

report from McKinsey on tactics to increase OxyContin sales.  The McKinsey report instructed

sales representatives to maximize profits by "emphasizing [the] broad range of doses"—which

was code for pushing the doses that were highest and most profitable.

54.     In February 2010, Purdue staff told the Sacklers that McKinsey estimated that

new tactics by Purdue sales representatives would generate $200 million to $400 million more in

sales of OxyContin, and that sales representatives had been practicing the new tactics in front of

management.  McKinsey had reported to Purdue on opportunities to increase prescriptions by

convincing doctors that opioids provide "freedom" and "peace of mind" and give patients "the

best possible chance to live a full and active life."  McKinsey also suggested sales "drivers"

based on the ideas that opioids reduce stress and make patients more optimistic and less isolated.

In fact, becoming addicted to opioids makes patients more stressed, more isolated, and less likely

to survive.

55.     In June of 2012, Purdue management assigned McKinsey the task of

understanding the significance of each of the major factors affecting OxyContin's sales.

McKinsey did this in granular detail, analyzing each sales channel for Purdue's opioids for

weaknesses and opportunities.  McKinsey's work in this regard would be crystallized in a series

of presentations made to the Sackler family and Purdue's board of directors in the summer of

2013 entitled, "Identifying Granular Growth Opportunities for OxyContin."

56.     McKinsey devised a myriad of marketing and sales stratagems to "turbocharge"

sales of OxyContin.  For example, McKinsey suggested the tactic of "patient pushback" where

McKinsey and Purdue would encourage patients to directly lobby their doctors for OxyContin

when those physicians expressed reservations regarding the administration of Purdue's opioids.

57.     The key prong of McKinsey's advice, however, was to identify historically large prescribers and target ever more sales and marketing resources on them.  For example, McKinsey devised a "physician segmentation" initiative whereby McKinsey would analyze the opioid prescribing patterns of individual physicians to identify those who had historically been the highest volume prescribers.  McKinsey then worked with Purdue's sales and marketing staff to specifically target those prescribers with a marketing blitz to encourage even further prescribing.

58.     Purdue trained its sales force in tactics to market to these high prescribers based on McKinsey's insights and designed in conjunction with McKinsey.  McKinsey identified these physicians as optimal targets for a massive marketing push to sell more OxyContin.  Over a three-year period, McKinsey requested, and Purdue provided, "prescriber-level milligram dosing data" so that it could further analyze the individual amounts of OxyContin prescribed by individual physicians.  McKinsey also requested that Purdue manage the target lists of each sales representative to assure that the maximum amount of each sales representative's time was spent with the most receptive customers.

59.     McKinsey helped shape Purdue's OxyContin marketing, which misleadingly centered on freedom and peace of mind for users.  The marketing was tailored to avoid running directly afoul of the Corporate Integrity Agreement, but it remained misleading given what Purdue and McKinsey knew about opioids.  One advertisement said, "We sell hope in a bottle," even though both McKinsey and Purdue already understood the addiction problems associated with opioid use and abuse.  McKinsey encouraged Purdue to tell doctors that OxyContin would give their patients "the best possible chance to live a full and active life."

60.     McKinsey urged Purdue to train and incentivize its sales representatives to increase sales across the market for opioids, even if sales went to Purdue's competitors.  This was intended to serve the Sackler family's goal of increasing the marketability of Purdue for potential mergers, but it had the effect of worsening the opioid crisis even beyond the portion of the crisis directly attributable to sales and use of OxyContin.

61.     By 2010, Purdue had implemented a four-year plan, consistent with McKinsey's strategy, to dramatically increase the quota of required annual sales visits by Purdue sales representatives to prescribers.  The quota was 545,000 visits in 2010, 712,000 visits in 2011, 752,000 in 2012, and 744,000 visits in 2013.  McKinsey also urged Purdue to increase individual visit quotas for sales representatives from 1,400 to 1,700 annually and, at the same time, recommended the time devoted to training the sales representatives be slashed by one-third.

**D.     Project Turbocharge**

62.     The Corporate Integrity Agreement expired in 2012.  With this restriction lifted, McKinsey devised additional marketing and sales strategies for Purdue to further increase OxyContin sales.

63.     On July 23, 2013, Purdue's board discussed concerns about the sales decline in higher strengths of Purdue's opioids as well as an observed sales decline in "tablets per Rx." McKinsey was assigned to actively monitor the number and size of opioid prescriptions written by individual doctors.

64.     McKinsey then unveiled "Project Turbocharge" to Purdue and stated that the most prolific OxyContin prescribers wrote "25 times as many OxyContin scripts" as less prolific prescribers and urged Purdue to "make a clear go-no go decision to 'Turbocharge the Sales Engine'" by devoting substantial capital toward McKinsey's plan.

65.     In developing Project Turbocharge, McKinsey conducted significant market research, including through ride-alongs with Purdue sales representatives to learn how they promoted OxyContin.  McKinsey carefully monitored Purdue sales representatives and provided guidance on prescriber messaging and adhering to target prescriber lists.  McKinsey advised that sales representatives do more to promote the so-called abuse deterrent properties of a reformulated version of OxyContin to address prescriber concerns about abuse risk.

66.     The new plans to increase sales of OxyContin had the following key components:

a.      focus sales calls on high-volume opioid prescribers, including those writing as many as twenty-five times as many OxyContin prescriptions as their lower volume counterparts;

b.      remove sales representative discretion in targeting prescribers;

c.      focus Purdue's marketing messaging to titrate to higher, more lucrative dosages;

d.      significantly increase the number of sales visits to high-volume prescribers; and

e.      create an "alternative model for how patients receive OxyContin," including direct distribution to patients and pharmacies, to help address the "product access" problem.

67.     Project Turbocharge called for a doubling of Purdue's sales budget on top of the skyrocketing promotional spending that McKinsey had already recommended, and Purdue implemented.

68.     By the time Project Turbocharge had been fully implemented, total quarterly sales and marketing spending at Purdue exceeded $45 million per quarter, an increase of 800%.

69.     In July 2013, the Sacklers discussed "threats" to their business from data on long-term opioid use, as public health authorities reacted to the danger of keeping patients on opioids for longer periods of time.  Meanwhile, Purdue staff sent the Sacklers a "Flash Report" that OxyContin sales had dropped $96,400,000 from the year before.  Staff explained to the Sacklers

17

that insufficient volume of sales representative visits to promote OxyContin to prescribers was an important reason for the dropping sales.  Staff told the Sacklers that they would increase the number of sales visits and had hired McKinsey to study how to get doctors to prescribe more OxyContin.

70.     Staff also reported to the Sacklers that key priorities were to reverse "the decline in higher strengths" of Purdue opioids, and the decline in "tablets per Rx," which were reducing Purdue's profit.  They told the Sacklers that Purdue staff were studying ways to fight these trends, and McKinsey would analyze the data down to the level of individual physicians.

71.     Mortimer Sackler asked for more detail on what was being done to increase sales. Staff told the Sacklers that McKinsey would analyze whether sales representatives were targeting the prescribers who were most susceptible to increasing opioid use.  Staff told the Sacklers that McKinsey would study whether Purdue could use incentive compensation to push representatives to generate more prescriptions.  Making the sales representatives' income depend on increasing prescriptions could be a powerful lever.  Staff told the Sacklers that McKinsey would study using "patient pushback" to get doctors to prescribe more opioids—when doctors hesitated to prescribe Purdue opioids, Purdue could get patients to lobby for the drugs.  Staff told the Sacklers that McKinsey would also study techniques for keeping patients on opioids longer, including the need for sales representatives "to make a lot of calls on physicians with a high number of continuing patients."

72.     Staff also reported to the Sacklers that they had trained Purdue's sales representatives to use new sales materials designed to get patients on higher doses of opioids for longer periods.  Staff told the Sacklers that Purdue employed 634 sales representatives and,

during Q2 2013, they visited prescribers 177,773 times.  Staff assured the Sacklers that they were trying to achieve even more sales visits by monitoring the representatives.

73.     Before the month ended, the Sacklers met to discuss a report on sales tactics that McKinsey had prepared for them—Identifying Granular Growth Opportunities for OxyContin: First Board Update.  McKinsey confirmed that Purdue's sales visits generated opioid prescriptions.  They urged the Sacklers to demand more sales visits from sales representatives, increasing each representative's annual quota from 1,400 towards 1,700.  McKinsey also advised the Sacklers to control the sales representatives' target lists more strictly, to make representatives visit doctors who give the biggest payoff.  Based on a review of data, McKinsey also suggested that the Sacklers should have staff emphasize opioid savings cards in neighborhoods with high concentrations of Walgreens pharmacies.  To allow even more targeted promotion of high doses, McKinsey asked the Sacklers to obtain "prescriber level milligram closing data" so they could analyze the doses prescribed by individual doctors.

74.     In August 2013, the Sacklers met to discuss a new McKinsey report on sales tactics—Identifying Granular Growth Opportunities for OxyContin:  Addendum to July 18th and August 5th Updates.  McKinsey recommended that the Sacklers immediately order a series of actions to increase sales.  First, McKinsey urged the Sacklers to direct sales representatives to the most prolific opioid prescribers.  The consultants told the Sacklers that prescribers in the more prolific group write "25 times as many OxyContin scripts" as less prolific prescribers.  They also reported to the Sacklers that sales representative visits to these prolific prescribers cause them to prescribe even more opioids—if Purdue ordered representatives to focus on the most prolific prescribers, it could increase sales.

75.     Second, McKinsey recommended that the Sacklers fight back against steps that the DEA, the U.S. Department of Justice, and others were taking to stop illegal drug sales.  Two months earlier, the Walgreens pharmacy company admitted that it broke the law by filling illegitimate prescriptions, and it agreed to new safeguards to stop illegal prescribing.  McKinsey told the Sacklers that "deep examination of Purdue's available pharmacy purchasing data shows that Walgreens has reduced its units by 18%."  Even worse for the Sacklers, the new safeguards were hurting sales of the highest doses:  "the Walgreens data also shows a significant impact on higher OxyContin dosages"—specifically the 80mg dose.  McKinsey urged the Sacklers to lobby Walgreens' leaders to loosen up.  For the longer term, McKinsey advised the Sacklers to develop a "direct-to-patient mail order" business for Purdue opioids, so they could sell the high doses without pharmacies getting in the way.

76.     Third, McKinsey advised the Sacklers that they should use their power on the Board to insist on increasing sales, with monthly accountability:  "Establish a revenue growth goal (*e.g.*, $150M incremental stretch goal by July 2014) and set monthly progress reviews with CEO and Board."  McKinsey knew what the Sacklers were looking for:  they reported that "the value at stake is significant—hundreds of millions, not tens of millions."  The consultants urged the Sacklers to make "a clear go-no go decision to 'Turbocharge the Sales Engine.'"

77.     In September and October of 2013, the Sacklers met again to discuss implementation of the sales tactics McKinsey had recommended.  The Sacklers discussed DEA efforts to stop illegal dispensing of opioids at CVS and Walgreens and how Purdue could get around the new safeguards by shifting to mail-order pharmacies, specialty pharmacies, or Purdue distributing opioids to patients directly.

78.     Meanwhile, McKinsey kept reporting to Purdue on tactics to get more patients on higher doses of opioids.  McKinsey found that Purdue could drive opioid prescriptions higher by targeting the highest-prescribing doctors and sending sales representatives to visit each prolific prescriber dozens of times per year.

79.     In October 2013, Mortimer Sackler pressed for more information on dosing and "the breakdown of OxyContin market share by strength."  Staff told the Sacklers that "the high dose prescriptions are declining," and "there are fewer patients titrating to the higher strengths from the lower ones."  In response to the Sacklers' insistent questions, staff explained that sales of the highest doses were not keeping up with the Sacklers' expectations because some pharmacies had implemented "good faith dispensing" policies to double-check prescriptions that looked illegal, and some prescribers were under pressure from the DEA.  Staff promised to increase the budget for promoting OxyContin by $50 million, and to get sales representatives to generate more prescriptions with a new initiative to be presented to the Sacklers the following week.

80.     By November 2013, McKinsey had obtained the physician-level data it had previously requested and continued to study ways to sell additional OxyContin prescriptions by refining and targeting the sales pitch to high-volume prescribers.

81.     McKinsey understood that the higher the dosage strength for any individual OxyContin prescription, the greater the profitability for Purdue.  Of course, higher dosage strength, particularly for longer periods of use, also contributes to opioid dependency, addiction, and abuse.  Nonetheless, McKinsey advised Purdue to focus on selling higher strength dosages of OxyContin.

82.     McKinsey's work on increasing individual prescription dose strength continued throughout the time McKinsey worked with Purdue.  Purdue implemented McKinsey's suggestions and used the slogan, "Individualize the Dose," and by 2013 encouraged its sales representatives to "practice verbalizing the titration message" when selling Purdue's opioids to prescribers.

83.     McKinsey also recommended the use of quotas and bonus payments to motivate the Purdue sales force to sell as many OxyContin prescriptions as possible.

84.     McKinsey's "Project Turbocharge" recommendations included revising the existing process for targeting high-prescribing physicians, with a shift from targeting solely based on prescription deciles to considering additional factors.  Based on its analysis, McKinsey told Purdue that "[t]here is significant opportunity to slow the decline of OxyContin by calling on more high-value physicians" and that "[t]he revenue upside from sales re-targeting and adherence could be up to $250 million."

85.     Despite knowing that the recently expired Corporate Integrity Agreement required Purdue to refrain from improperly incentivizing OxyContin sales, McKinsey also recommended increasing incentive compensation for incremental OxyContin prescriptions, advising Purdue that "[r]evision to incentive comp could better align reps to Purdue's economics."

86.     At the same time, McKinsey recommended decreasing training by six days a year to allow employees more time to make sales calls.  Meanwhile, McKinsey advised Purdue to exercise closer control over its sales staff to generate more efficient physician targeting.

87.     Physician targeting proved effective.  McKinsey advised Purdue that visiting high-prescribing doctors many times per year increased sales.

88.     McKinsey recommended that Purdue circumvent pharmacies entirely with a mail-order program because enforcement by federal regulators was decreasing OxyContin dispensing through Walgreens.

89.     At the board level, McKinsey urged the Sacklers to impose a "revenue growth goal" on management.

90.     With McKinsey's ongoing involvement and advice, Purdue implemented McKinsey's recommendations discussed above, but rebranded the program from Project Turbocharge to E2E.

91.     McKinsey's efforts had the effect the Sacklers had asked McKinsey to achieve. Sales of OxyContin tripled in the years following the 2007 guilty plea, despite the restrictions imposed by the Corporate Integrity Agreement.  According to the U.S. Department of Justice, "[f]rom 2010 to 2018, Purdue's profits were almost entirely driven by its success in selling OxyContin."

92.     McKinsey's efforts truly did "turbocharge" the sales of OxyContin.  In 2007, the year of Purdue's guilty plea, net sales of OxyContin totaled approximately $1 billion.  By 2010, after McKinsey was advising Purdue on how to maximize sales, OxyContin sales exceeded $3 billion—a tripling of revenue from OxyContin sales.

93.     OxyContin sales reached their peak in 2013, the year Project Turbocharge was proposed and adopted.  In 2014, according to Purdue, there were 5.4 million OxyContin prescriptions written, 80% for twelve-hour dosing.  Of those, more than half were for doses greater than 60 milligrams per day.

94.     The Sacklers did not sell Purdue or enter a merger, but their goal of extracting wealth from the business was realized.  The Sackler family has withdrawn over $10 billion from

Purdue since 2008, including $1.7 billion in 2009 alone.  These distributions were made possible by McKinsey's services and came at the expense of a deepening national opioid crisis.

     **E.**    **McKinsey Knew About Dangers of Opioids and Acted to Maximize OxyContin Prescriptions Anyway**

     95.     McKinsey has a long history of consulting in the pharmaceutical industry.  In addition to its work with Purdue, McKinsey has performed "opioid-related work" for Johnson & Johnson, Endo International, and Mallinckrodt Pharmaceuticals.  For instance, a McKinsey PowerPoint presentation prepared for Johnson & Johnson recommended that Johnson & Johnson aggressively target and influence doctors treating back pain to increase opioid sales.

     96.     Purdue's 2007 guilty plea put McKinsey on notice of Purdue's misconduct.  By that time, McKinsey had access to public information indicating that OxyContin and other opioids pose significant risk of addiction and misuse.

     97.     McKinsey's presentations to Purdue in 2013 included extensive discussion of doctors' concerns about opioid misuse and side effects, demonstrating McKinsey's awareness of the dangers of opioids.  Rather than working to limit the dangerous effects of opioids, McKinsey treated doctors' misgivings as obstacles to overcome with new messaging.

     98.     On October 23, 2017, the President of the United States declared the nationwide opioid epidemic a "public health emergency."  Even so, McKinsey continued to propose solutions to Purdue to further boost opioid sales.  These solutions were touted by McKinsey as "high impact interventions to rapidly address market access challenges."

     99.     McKinsey continued working with Purdue long after the severity of the opioid crisis was well known.  In 2017, McKinsey proposed that Purdue pay CVS and other distributors of OxyContin rebates "for every OxyContin overdose attributable to pills they sold."

100.    A former McKinsey consultant described McKinsey's work with Purdue as "the banality of evil, M.B.A. edition . . . .  They knew what was going on. And they found a way to look past it, through it, around it, so as to answer the only questions they cared about:  how to make the client money and, when the walls closed in, how to protect themselves."

101.    In a 2018 email thread, apparently fearing consequences for McKinsey's work with Purdue, two McKinsey senior partners who had participated in McKinsey's work advising Purdue discussed deleting documents related to opioids.

**F.    Purdue's 2020 Guilty Plea and McKinsey's Recent Statement**

102.    In October of 2020, Purdue once again reached an agreement (the "2020 Settlement Agreement") with the U.S. Department of Justice to enter a guilty plea related to its marketing of OxyContin.  The agreement includes $8.3 billion in penalties from Purdue and $225 million from the Sackler family.

103.    In the 2020 Settlement Agreement, Purdue pleaded guilty to defrauding health agencies, violating anti-kickback laws, paying illegal kickbacks to doctors, and "using aggressive marketing tactics to convince doctors to unnecessarily prescribe opioids—frivolous prescriptions that experts say helped fuel a drug addiction crisis that has ravaged America for decades."

104.    This time the plea agreement concerned conduct from 2010 to 2018.  The plea agreement directly implicates McKinsey in the conspiracy.

105.    The 2020 Settlement Agreement was entered by Purdue and the United States government.  It explicitly states that it does not release Purdue of "[a]ny liability for claims of the states or Indian tribes."

106.    The 2020 Settlement Agreement includes a provision specifically reserving claims regarding "[a]ny liability of entities other than the [Purdue Bankruptcy] Debtors, including consultants."

25

107.     On December 5, 2020, McKinsey issued the following statement regarding its

work with Purdue:

> December 5, 2020—As we look back at our client service during the opioid crisis,
> we recognize that we did not adequately acknowledge the epidemic unfolding in
> our communities or the terrible impact of opioid misuse and addiction on millions
> of families across the country. That is why last year we stopped doing any work on
> opioid-specific business, anywhere in the world.
>
> Our work with Purdue was designed to support the legal prescription and use of
> opioids for patients with legitimate medical needs, and any suggestion that our work
> sought to increase overdoses or misuse and worsen a public health crisis is wrong.
> That said, we recognize that we have a responsibility to consider the broader
> context and implications of the work that we do. Our work for Purdue fell short of
> that standard.
>
> We have been undertaking a full review of the work in question, including into the
> 2018 email exchange which referenced potential deletion of documents. We
> continue to cooperate fully with the authorities investigating these matters.

108.     McKinsey's work for opioid manufacturers extended beyond Purdue.  McKinsey

collected millions of dollars designing and implementing marketing programs for the country's

largest opioid manufacturers, including Johnson & Johnson and Endo.  It designed and

implemented marketing plans like those it created for Purdue.

109.     In February 2021, McKinsey settled opioid-related claims with 49 states, the

District of Columbia, and five U.S. territories.

## III.     FACTUAL ALLEGATIONS PERTAINING TO CLAIMS UNDER THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO")

### A.     The Common Purpose and Scheme of the Opioid Marketing Enterprise

110.     Knowing that their products were highly addictive, ineffective, and unsafe for the

treatment of long-term chronic pain, non-acute, and non-cancer pain, McKinsey, which

participated in the marketing and sale of opioids as described in this Complaint, and

manufacturers of opioids, including Purdue, Johnson & Johnson, Cephalon, Janssen, Endo, and

Mallinckrodt (collectively, including McKinsey, the "Opioid Marketing Enterprise Members"), formed an association-in-fact enterprise and engaged in a scheme to unlawfully increase their profits and sales, and grow their share of the prescription painkiller market, through repeated and systematic misrepresentations about the safety and efficacy of opioids for treating long-term chronic pain.

111.    To unlawfully increase the demand for opioids, the Opioid Marketing Enterprise Members formed an association-in-fact enterprise (the "Opioid Marketing Enterprise").  Through their personal relationships, the members of the Opioid Marketing Enterprise had the opportunity to form and take actions in furtherance of the Opioid Marketing Enterprise's common purpose. The Opioid Marketing Enterprise Members' substantial financial contribution to the Opioid Marketing Enterprise, and the advancement of opioid-friendly messaging, fueled the U.S. opioids epidemic.

112.    The Opioid Marketing Enterprise Members, through the Opioid Marketing Enterprise, concealed the true risks and dangers of opioids from the medical community and the public, including the Tribe, and made misleading statements and misrepresentations about opioids that downplayed the risk of addiction and exaggerated the benefits of opioid use.  The misleading statements included:  (a) that addiction is rare among patients taking opioids for pain; (b) that addiction risk can be effectively managed; (c) that symptoms of addiction exhibited by opioid patients are actually symptoms of an invented condition the Opioid Marketing Enterprise Members named "pseudoaddiction"; (d) that withdrawal is easily managed; (e) that increased dosing presents no significant risks; (f) that long-term use of opioids improves function; (g) that the risks of alternative forms of pain treatment are greater than the adverse effects of opioids; (h) that use of time-released dosing prevents addiction; (i) that abuse-deterrent formulations

provide a solution to opioid abuse; and (j) that opioids would bring patients freedom and peace of mind.

113.    The scheme devised, implemented, and conducted by the Opioid Marketing Enterprise Members was a common course of conduct designed to ensure that the Opioid Marketing Enterprise Members unlawfully increased their sales and profits through concealment and misrepresentations about the addictive nature and effective use of the Opioid Marketing Enterprise Members' drugs.  The Opioid Marketing Enterprise Members acted together for a common purpose and perpetuated the Opioid Marketing Enterprise's scheme, including through the unbranded promotion and marketing network as described above.

114.    There was regular communication between the Opioid Marketing Enterprise Members in which information was shared, misrepresentations were coordinated, and payments were exchanged.  The Opioid Marketing Enterprise Members functioned as a continuing unit for the purpose of implementing the Opioid Marketing Enterprise's scheme and common purpose, and each agreed and took actions to hide the scheme and continue its existence.

115.    As public scrutiny and media coverage focused on how opioids ravaged communities throughout the United States, McKinsey did not challenge Purdue or other manufacturers' misrepresentations, seek to correct their previous misrepresentations, terminate their role in the Opioid Marketing Enterprise, nor disclose publicly that the risks of using opioids for chronic pain outweighed their benefits and were not supported by medically acceptable evidence.  Instead, McKinsey continued to participate in the Opioid Marketing Enterprise for financial gain.

116.    The Opioid Marketing Enterprise Members engaged in certain discrete categories of activities in furtherance of the common purpose of the Opioid Marketing Enterprise.  The

Opioid Marketing Enterprise's conduct in furtherance of the common purpose of the Opioid Marketing Enterprise involved misrepresentations regarding the risk of addiction and safe use of prescription opioids for long-term chronic pain.

117.    The impact of the Opioid Marketing Enterprise's scheme is still in place—*i.e.*, the opioids continue to be prescribed and used for chronic pain throughout the Tribe's reservation and communities, and the epidemic continues to injure the Tribe, and consume the Tribe's resources.

118.    As a result, the Opioid Marketing Enterprise Members, including McKinsey, were each a willing participant in the Opioid Marketing Enterprise, had a common purpose and interest in the object of the scheme, and functioned within a structure designed to effectuate the Enterprise's purpose.

**B.    The Conduct of the Opioid Marketing Enterprise Violated Civil RICO**

119.    From at least 2004 to the present, each of the Opioid Marketing Enterprise Members exerted control over the Opioid Marketing Enterprise and participated in the operation or management of the affairs of the Opioid Marketing Enterprise, directly or indirectly, in the following ways:

      a.    Creating and providing a body of deceptive, misleading, and unsupported medical and popular literature about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

      b.    Creating and providing a body of deceptive, misleading, and unsupported electronic and print advertisements about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

      c.    Creating and providing a body of deceptive, misleading, and unsupported sales and promotional training materials about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be

the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

    d.    Devised and implemented marketing schemes that included targeting and misleading physicians, unlawfully incentivizing sales representatives to maximize prescriptions and dosages, and evading regulatory constraints;

    e.    Disseminating many of their false, misleading, imbalanced, and unsupported statements through unbranded materials that appeared to be independent publications; and

    f.    Using front groups and key opinion leaders ("KOLs") to mislead the public about opioids.

120.    The scheme devised and implemented by the Opioid Marketing Enterprise Members amounted to a common course of conduct intended to increase the Opioid Marketing Enterprise Members' sales from prescription opioids by encouraging the prescribing and use of opioids for long-term chronic pain.  The scheme was a continuing course of conduct, and many aspects of it continue through to the present.

### C.    Pattern of Racketeering Activity

121.    The Opioid Marketing Enterprise Members' scheme described herein was perpetrated, in part, through multiple acts of mail fraud and wire fraud, constituting a pattern of racketeering activity as described herein.

122.    The pattern of racketeering activity used by the Opioid Marketing Enterprise Members and the Opioid Marketing Enterprise likely involved thousands of separate instances of the use of the U.S. Mail or interstate wire facilities in furtherance of the unlawful Opioid Marketing Enterprise, including essentially uniform misrepresentations, concealments, and material omissions with the goal of profiting from increased sales of the Opioid Marketing Enterprise Members' drugs induced by consumers, prescribers, regulators, and the Tribe's reliance on the Opioid Marketing Enterprise Members' misrepresentations.

123.    Each of these fraudulent mailings and interstate wire transmissions constitutes racketeering activity, and collectively, these violations constitute a pattern of racketeering activity, through which the Opioid Marketing Enterprise Members defrauded and intended to defraud the Tribe, and other intended victims.

124.    The Opioid Marketing Enterprise Members devised and knowingly carried out an illegal scheme and artifice to defraud by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts.  The Opioid Marketing Enterprise Members and members of the Opioid Marketing Enterprise knew that these representations violated the FDA-approved use of these drugs and were not supported by actual evidence.  The Opioid Marketing Enterprise Members intended that their common purpose and scheme to defraud would, and did, use the U.S. Mail and interstate wire facilities, intentionally and knowingly, with the specific intent to advance, and for the purpose of executing, their illegal scheme.

125.    By intentionally concealing the material risks and affirmatively misrepresenting the benefits of using opioids for chronic pain to prescribers, regulators, and the public, including the Tribe, the Opioid Marketing Enterprise Members engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

126.    The Opioid Marketing Enterprise Members' use of the U.S. Mail and interstate wire facilities to perpetrate the opioids marketing scheme involved thousands of communications, publications, representations, statements, electronic transmissions, and payments, including, *inter alia*:

> a)    Marketing materials about opioids, and their risks and benefits, which the Opioid Marketing Enterprise Members sent to health care providers, transmitted through the Internet and television, published, and transmitted

to front groups and KOLs located across the country and on and near the Tribe's reservation;

b)      Written representations and telephone calls among the Opioid Marketing Enterprise Members, and between the Opioid Marketing Enterprise Members and front groups, regarding the misrepresentations, marketing statements, and claims about opioids, including the non-addictive, safe use of chronic long-term pain generally;

c)      Written representations and telephone calls among the Opioid Marketing Enterprise Members, and between the Opioid Marketing Enterprise Members and KOLs regarding the misrepresentations, marketing statements, and claims about opioids, including the non-addictive, safe use of chronic long-term pain generally;

d)      E-mails, telephone, and written communications among the Opioid Marketing Enterprise Members, and between the Opioid Marketing Enterprise Members and the front groups agreeing to or implementing the opioids marketing scheme;

e)      E-mails, telephone, and written communications among the Opioid Marketing Enterprise Members, and between the Opioid Marketing Enterprise Members and the KOLs agreeing to or implementing the opioids marketing scheme;

f)      Communications among the Opioid Marketing Enterprise Members, and between the Opioid Marketing Enterprise Members, front groups, and the media regarding publication, drafting of treatment guidelines, and the dissemination of the same as part of the Opioid Marketing Enterprise;

g)      Communications among the Opioid Marketing Enterprise Members, and between the Opioid Marketing Enterprise Members, KOLs, and the media regarding publication, drafting of treatment guidelines, and the dissemination of the same as part of the Opioid Marketing Enterprise;

h)      Written and oral communications directed to the Tribe and/or its citizens that fraudulently misrepresented the risks and benefits of using opioids for chronic pain; and

i)      Receipts of increased profits sent through the U.S. Mail and interstate wire facilities—the wrongful proceeds of the scheme.

127.    In addition to the above-referenced predicate acts, it was intended by and foreseeable to the Opioid Marketing Enterprise Members that the front groups and KOLs would distribute publications through the U.S. Mail and by interstate wire facilities, and, in those

32

publications, claim that the benefits of using opioids for chronic pain outweighed the risks of doing so.

128.    To achieve the common goal and purpose of the Opioid Marketing Enterprise, the Opioid Marketing Enterprise Members and members of the Opioid Marketing Enterprise hid from the consumers, prescribers, regulators, and the Tribe:  (a) the fraudulent nature of the Opioid Marketing Enterprise Members' marketing scheme; (b) the fraudulent nature of statements made by the Opioid Marketing Enterprise Members and by their KOLs, front groups, and other third parties regarding the safety and efficacy of prescription opioids; and (c) the true nature of the relationship between the members of the Opioid Marketing Enterprise.

129.    The Opioid Marketing Enterprise Members, and each member of the Opioid Marketing Enterprise, agreed, with knowledge and intent, to the overall objective of the Opioid Marketing Enterprise Members' fraudulent scheme and participated in the common course of conduct to commit acts of fraud and indecency in marketing prescription opioids.

130.    Indeed, for the Opioid Marketing Enterprise Members' fraudulent scheme to work, each of them had to agree to implement similar tactics regarding fraudulent marketing of prescription opioids.  This conclusion is supported by the fact that opioid manufacturers among the Opioid Marketing Enterprise Members financed, supported, and worked through the same KOLs and front groups, and often collaborated on and mutually supported the same publications, continuing medical education ("CME") programs, presentations, and prescription guidelines.

131.    The Opioid Marketing Enterprise Members' predicate acts all had the purpose of creating the opioid epidemic that substantially injured the Tribe's business and property, while simultaneously generating billion-dollar revenue and profits for the Opioid Marketing Enterprise Members.  The predicate acts were committed or caused to be committed by the Opioid

Marketing Enterprise Members through their participation in the Opioid Marketing Enterprise and in furtherance of its fraudulent scheme.

## IV.   MCKINSEY'S MISCONDUCT HAS INJURED AND CONTINUES TO INJURE THE TRIBE AND ITS CITIZENS

132.    McKinsey and its co-conspirators had the ability and the duty to prevent misleading marketing and prescription opioid diversion, both of which presented known or foreseeable dangers of serious injury.  But they failed to do so, resulting in substantial injury to the Tribe and its citizens.

133.    McKinsey and its co-conspirators' marketing campaigns have resulted in a significant increase in both name-brand and generic prescription opioid usage:  between 1999 and 2016 the number of opioids prescribed nationwide quadrupled.  Nationally, the number of people who take prescription opioids for non-medical purposes is now greater than the number of people who use cocaine, heroin, hallucinogens, and inhalants combined.

134.    Every year, millions of Americans abuse opioid pain relievers, leading to addiction, overdose, and death.  Data from the Substance Abuse and Mental Health Services Administration suggest that in 2016, among Americans over the age of twelve, over 1.75 million were prescription opioid-dependent, and over 11.5 million used prescription opioids for non-medical purposes.

135.    Similarly, DEA data for the most common prescription opioids show that in 2016, Oregon saw an annual distribution approximately 350 milligrams per resident, which is far more than is medically necessary.  In the same year, Oregon's rate of retail opioid prescriptions dispensed, at 76.3 prescriptions per 100 people, exceeded the national average, as it has in all recent years.

136.    This growth in non-medical demand, addiction, and diversion has led to serious harm to the Tribe and its citizens.  The increase in opioid usage has led to levels of addiction that, according to the U.S. Surgeon General, have "devastated" communities across America. Princeton University economist Alan Krueger found that opioids may be responsible for roughly 20% of the national decline in workforce participation by prime-age men and 25% of the drop by prime-age women.  In 2011, the CDC reported that overdose deaths from prescription opioids had reached "epidemic levels."  That year, 16,917 people in the United States died from a prescription opioid-related overdose.  Since then, the national death toll has continued to rise.  In 2014, 18,893 people died from a prescription opioid-related overdose.  In 2015, that number increased again to 22,598.  As discussed above, overdose deaths in the United States involving prescription opioids have quadrupled since 1999.  CDC data shows that over 123,095 people died from prescription opioid overdoses from 2011 to 2016.

137.    It was reasonably foreseeable to McKinsey and its co-conspirators that their deceptive and reckless marketing of opioids on and around the Tribe's reservation and communities would allow opioids to fall into the hands of addicts and other inappropriate users.

138.    It was reasonably foreseeable to McKinsey and its co-conspirators that their deceptive, unfair, and false marketing campaigns would cause injuries, including abuse, addiction, overdoses, and death.  It was also reasonably foreseeable that many of these injuries would be suffered by the Tribe and its citizens, and that the costs of these injuries would be shouldered by the Tribe.

139.    McKinsey and its co-conspirators knew or should have known that their continuing efforts to employ deceptive, unfair, and false marketing, despite being previously

sanctioned by government agencies for such actions, would contribute to the opioid epidemic affecting the Tribe.

140.   McKinsey and its co-conspirators knew or should have known that a substantial amount of the opioids dispensed on and around the Tribe's reservation and communities were being dispensed because of their deceptive, unfair, and false marketing.  It was foreseeable that the increased number of prescriptions for opioids resulting from McKinsey and its co-conspirators deceptive, unfair, and false marketing would cause harm to individual pharmacy customers, third parties, and the Tribe.

141.   McKinsey and its co-conspirators made substantial profits over the years based on the deceptive, unfair, and false marketing of opioids on and around the Tribe's reservation and communities.  Their participation and cooperation in a common enterprise have foreseeably caused damages to the Tribe and injuries to its citizens.  McKinsey and its co-conspirators knew or should have known that the Tribe would be unjustly forced to bear the costs of these injuries and damages.

142.   McKinsey and its co-conspirators' deceptive, unfair, and false marketing of prescription opioids to the Tribe's communities showed a reckless disregard for the safety of the Tribe and its citizens.  Their conduct poses a continuing threat to the health, safety, and welfare of the Tribe and its citizens.

143.   McKinsey's misleading marketing and failure to prevent prescription opioid diversion damaged the Tribe and its citizens.  McKinsey's misconduct has contributed to a range of social problems, including violence and delinquency.  Adverse social outcomes include child neglect, family dysfunction, babies born addicted to opioids, criminal behavior, poverty, property damage, unemployment, and social despair.  As a result, more and more of the Tribe's resources

are devoted to addiction-related problems.  Meanwhile, the opioid crisis diminishes the Tribe's available workforce, decreases productivity, increases poverty, and consequently requires greater expenditures by the Tribe.

## CLAIMS FOR RELIEF

### COUNT I
### RICO 18 U.S.C. § 1962(C)

144.     The Tribe incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein, and further alleges as follows:

145.     This claim is brought by the Tribe against Defendant McKinsey for actual damages, treble damages, and equitable relief under 18 U.S.C. § 1964(c).

146.     At all relevant times, McKinsey is and has been a "person" under 18 U.S.C. § 1961(3) because it is capable of holding, and does hold, "a legal or beneficial interest in property."

147.     Each Plaintiff is a "person," as that term is defined in 18 U.S.C. § 1961(3) and has standing to sue as it was and is injured in its business and/or property because of McKinsey's wrongful conduct described herein.

148.     The Opioid Marketing Enterprise conducted an association-in-fact enterprise, and/or participated in the conduct of an enterprise through a pattern of illegal activities (the predicate racketeering acts of mail and wire fraud) to carry out the common purpose of the Opioid Marketing Enterprise, *i.e.*, to unlawfully increase profits and revenues from the continued prescription and use of opioids for long-term chronic pain.  Through the racketeering activities of the Opioid Marketing Enterprise, the Opioid Marketing Enterprise Members sought to further the common purpose of the enterprise through a fraudulent scheme to change prescriber habits and public perception about the safety and efficacy of opioid use.  In so doing, each of the Opioid

Marketing Enterprise Members knowingly conducted and participated in the conduct of the

Opioid Marketing Activities by engaging in mail and wire fraud in violation of 18 U.S.C.

§§ 1962(c) and (d).

149.    The Opioid Marketing Enterprise is an association-in-fact enterprise that consists

of the Opioid Marketing Enterprise Members.

150.    Each of the Opioid Marketing Enterprise Members conducted and participated in

the conduct of the Opioid Marketing Enterprise by playing a distinct role in furthering the

enterprise's common purpose of increasing profits and sales through the knowing and intentional

dissemination of false and misleading information about the safety and efficacy of long-term

opioid use, and the risks and symptoms of addiction, in order to increase the market for

prescription opioids by changing prescriber habits and public perceptions.

151.    Specifically, the Opioid Marketing Enterprise Members each worked together to

coordinate the enterprise's goals and conceal their role, and the enterprise's existence, from the

public by, among other things, (a) funding, editing, and distributing publications that supported

and advanced their false messages; (b) funding KOLs to further promote their false messages;

and (c) tasking their own employees to direct deceptive marketing materials and pitches directly

at physicians.

152.    Further, each of the Opioid Marketing Enterprise Members had systematic links

to and personal relationships with each other through joint participation in lobbying groups, trade

industry organizations, contractual relationships, and continuing coordination of activities.  The

systematic links and personal relationships that were formed and developed allowed members of

the Opioid Marketing Enterprise the opportunity to form the common purpose and agree to

conduct and participate in the conduct of the Opioid Marketing Enterprise.  Specifically, each of

the Opioid Marketing Enterprise Members, including McKinsey working with and through the other Opioid Marketing Enterprise Members, coordinated their efforts through the same KOLs and front groups, based on their agreement and understanding that the front groups and KOLs were industry friendly and would work together with the Opioid Marketing Enterprise Members to advance the common purpose of the Opioid Marketing Enterprise; and each of the individuals and entities who formed the Opioid Marketing Enterprise acted to enable the common purpose and fraudulent scheme of the Opioid Marketing Enterprise.

153.    At all relevant times, the Opioid Marketing Enterprise:  (a) had an existence separate and distinct from each Opioid Marketing Enterprise Member; (b) was separate and distinct from the pattern of racketeering in which the Opioid Marketing Enterprise Members engaged; (c) was an ongoing and continuing organization consisting of individuals, persons, and legal entities, including each of the Opioid Marketing Enterprise Members; (d) was characterized by interpersonal relationships between and among each member of the Opioid Marketing Enterprise; and (e) had sufficient longevity for the enterprise to pursue its purpose and functioned as a continuing unit.

154.    The Opioid Marketing Enterprise Members conducted and participated in the conduct of the Opioid Marketing Enterprise through a pattern of racketeering activity that employed the use of U.S. Mail and interstate wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud), to increase profits and revenue by changing prescriber habits and public perceptions to increase the prescription and use of prescription opioids and expand the market for opioids.

155.    The Opioid Marketing Enterprise Members each committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity

(*i.e.*, violations of 18 U.S.C. §§ 1341 and 1343) within the past ten years.  The multiple acts of

racketeering activity that the Opioid Marketing Enterprise Members committed, or aided and

abetted in the commission of, were related to each other, posed a threat of continued racketeering

activity, and therefore constitute a "pattern of racketeering activity."  The racketeering activity

was made possible by the Opioid Marketing Enterprise Members' regular use of the facilities,

services, distribution channels, and employees of the Opioid Marketing Enterprise, the U.S. Mail

and interstate wire facilities.  The Opioid Marketing Enterprise Members participated in the

scheme to defraud by using mail, telephones, and the Internet to transmit mailings and wires in

interstate or foreign commerce.

156.    The Opioid Marketing Enterprise Members' predicate acts of racketeering

(18 U.S.C. § 1961(1)) include, but are not limited to:

      a)    Mail Fraud: The Opioid Marketing Enterprise Members violated
18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or
received, materials via U.S. Mail or commercial interstate carriers for the
purpose of executing the unlawful scheme to design, manufacture, market,
and sell the prescription opioids by means of false pretenses,
misrepresentations, promises, and omissions.

      b)    Wire Fraud: The Opioid Marketing Enterprise Members violated
18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be
transmitted and/or received, materials by wire for the purpose of executing
the unlawful scheme to design, manufacture, market, and sell the
prescription opioids by means of false pretenses, misrepresentations,
promises, and omissions.

157.    Indeed, as summarized herein, the Opioid Marketing Enterprise Members used

the mailings and wire transmissions to send or receive thousands of communications,

publications, representations, statements, electronic transmissions, and payments to carry out the

Opioid Marketing Enterprise's fraudulent scheme.

158.    Because the Opioid Marketing Enterprise Members disguised their participation

in the enterprise, and worked to keep even the enterprise's existence secret so as to give the false

appearance that their false messages reflected the views of independent third parties, many of the precise dates of the Opioid Marketing Enterprise's uses of the U.S. Mail and interstate wire facilities (and corresponding predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to the books and records maintained by the Opioid Marketing Enterprise Members, front groups, and KOLs.  Indeed, an essential part of the successful operation of the Opioid Marketing Enterprise alleged herein depended upon secrecy.  However, the Tribe has described the occasions on which the Opioid Marketing Enterprise Members disseminated misrepresentations and false statements to consumers, prescribers, regulators, and the Tribe, and how those acts were in furtherance of the enterprise's fraudulent scheme.

159.    Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including consumers, prescribers, regulators, and the Tribe.  The Opioid Marketing Enterprise Members calculated and intentionally crafted the scheme and common purpose of the Opioid Marketing Enterprise to ensure their own profits remained high. In designing and implementing the scheme, the Opioid Marketing Enterprise Members understood and intended that those in the distribution chain rely on the integrity of the pharmaceutical companies and ostensibly neutral third parties to provide objective and scientific evidence regarding the Opioid Marketing Enterprise Members' products.

160.    The Opioid Marketing Enterprise Members' pattern of racketeering activity alleged herein, and the Opioid Marketing Enterprise are separate and distinct from each other. Likewise, the Opioid Marketing Enterprise Members are distinct from the Opioid Marketing Enterprise.

161.    The racketeering activities conducted by the Opioid Marketing Enterprise Members amounted to a common course of conduct, with a similar pattern and purpose, intended to deceive consumers, prescribers, regulators, and the Tribe.  Each separate use of the U.S. Mail and/or interstate wire facilities employed by Defendant was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including consumers, prescribers, regulators, and the Tribe.  The Opioid Marketing Enterprise Members have engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the Opioid Marketing Enterprise.

162.    Each of the Opioid Marketing Enterprise Members aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses.

163.    As described herein, the Opioid Marketing Enterprise Members engaged in a pattern of related and continuous predicate acts for years.  The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant money and revenue from the marketing and sale of their highly addictive and dangerous drugs.  The predicate acts also had the same or similar results, participants, victims, and methods of commission.  The predicate acts were related and not isolated events.

164.    The Opioid Marketing Enterprise Members' violations of law and their pattern of racketeering activity directly and proximately caused the Tribe injury in its business and property.  The Opioid Marketing Enterprise Members' pattern of racketeering activity logically, substantially, and foreseeably caused an opioid epidemic.  The Tribe's injuries, as described below, were not unexpected, unforeseen, or independent.  Rather, as the Tribe alleges, the Opioid Marketing Enterprise Members knew that the opioids were unsuited to treatment of long-term

chronic, non-acute, and non-cancer pain, or for any other use not approved by the FDA, and knew that opioids were highly addictive and subject to abuse.  Nevertheless, the Opioid Marketing Enterprise Members engaged in a scheme of deception that utilized the U.S. Mail and interstate wire facilities to carry out the Opioid Marketing Enterprises' fraudulent scheme, thereby increasing sales of their opioid products.

165.    It was foreseeable and expected that the Opioid Marketing Enterprise Members creating and then participating in the Opioid Marketing Enterprise through a pattern of racketeering activities to carry out their fraudulent scheme would lead to a nationwide opioid epidemic, including increased opioid addiction and overdose.

166.    Defendant's misleading marketing and failure to prevent prescription opioid diversion damaged the Tribe and its citizens.  Defendant's misconduct has contributed to a range of social problems, including violence and delinquency.  Adverse social outcomes include child neglect, family dysfunction, babies born addicted to opioids, criminal behavior, poverty, property damage, unemployment, and social despair.  As a result, more and more of the Tribe's resources are devoted to addiction-related problems.

167.    Specifically, the Opioid Marketing Enterprise Members' creation of, and then participation in, the Opioid Marketing Enterprise through a pattern of racketeering activities to carry out their fraudulent scheme has injured the Tribe in the form of substantial losses of money and property that logically, directly, and foreseeably arise from the opioid-addiction epidemic. The Tribe's injuries, as alleged throughout this Complaint, and expressly incorporated herein by reference, include:

    a)    Costs for providing healthcare and medical care, additional therapeutic, and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths;

b)     Costs of training first responders in the proper treatment of drug overdoses;

c)     Costs associated with providing first responders with naloxone—an opioid antagonist used to block the deadly effects of opioids in the context of overdose;

d)     Costs associated with emergency responses by first responders to opioid overdoses;

e)     Costs for providing mental-health services, treatment, counseling, rehabilitation services, and social services to victims of the opioid epidemic and their families;

f)     Costs for providing treatment of infants born with opioid-related medical conditions, or born dependent on opioids due to drug use by mothers during pregnancy;

g)     Costs associated with the injuries to the health and welfare of the Tribe and its citizens caused by the opioid epidemic;

h)     Costs associated with providing care for children whose parents suffer from opioid-related disability or incapacitation;

i)     Losses caused by the diversion of revenue from the Tribe's businesses to address the opioid epidemic that would otherwise have been reinvested in the Tribe's businesses; and

j)     Costs associated with removal of hazardous waste from the Tribe's communities, including on the Tribe's real property.

168.    The Tribe's injuries were directly and thus proximately caused by these racketeering activities because they were the logical, substantial, and foreseeable cause of the Tribe's injuries.  But for the opioid-addiction epidemic the Opioid Marketing Enterprise Members created through their Opioid Marketing Enterprise, the Tribe would not have lost money or property, and the health and welfare of the Tribe and its citizens would not have been injured.

169.    The Tribe is the most directly harmed entity, and there are no other plaintiffs better suited to seek a remedy for the economic harms at issue here.

## COUNT II
## RICO 18 U.S.C. § 1962(D)

170.     The Tribe realleges and incorporates by reference the foregoing allegations as if set forth at length herein.

171.     McKinsey conspired with the other members of the Opioid Marketing Enterprise from at least 2009 until 2020.

172.     The object of the conspiracy was to ensure that McKinsey and the other Opioid Marketing Enterprise Members unlawfully increased their sales and profits through concealment and misrepresentations about the addictive nature and effective use of the Opioid Marketing Enterprise Members' drugs.

173.     The overt acts taken in furtherance of the conspiracy are alleged above.

174.     McKinsey and the other Opioid Marketing Enterprise Members agreed to commit the predicate acts described above.

175.     McKinsey and the other Opioid Marketing Enterprise Members acted with knowledge that the predicate acts were part of a pattern of racketeering activity conducted in such a way as to violate 18 U.S.C. §§ 1962(a), (b), or (c).

176.     As described above, the Tribe was injured in its business or property by reason of the overt acts described above.

## COUNT III
## RICO 18 U.S.C. § 1962(A)

177.     The Tribe realleges and incorporates by reference the foregoing allegations as if set forth at length herein.

178.     McKinsey received income from the pattern of racketeering set forth above.

179.     McKinsey invested this income in an enterprise that bears a nexus to interstate commerce.

180.    The Tribe was injured in its business or property by reason of McKinsey's use or investment of the income in the enterprise as described above.

## COUNT IV
## RICO 18 U.S.C. § 1962(B)

181.    The Tribe realleges and incorporates by reference the foregoing allegations as if set forth at length herein.

182.    McKinsey acquired or maintained an interest in, or control of, the Opioid Marketing Enterprise which was engaged in the predicate acts described above which affected interstate commerce.

183.    The Tribe was injured in its business or property by reason of McKinsey's acquisition or maintenance of the interest in, or control of, the enterprise as described above.

## COUNT V
## PUBLIC NUISANCE

184.    The Tribe realleges and incorporates by reference the foregoing allegations as if set forth at length herein.

185.    Section 821B of the Restatement (Second) Torts defines a "public nuisance" as "an unreasonable interference with a right common to the general public."

186.    This action is brought by the Tribe to abate the public nuisance created by McKinsey through its work with Purdue and other opioid manufacturers, distributors, and retailers.

187.    McKinsey has created and/or assisted in the creation of a condition that significantly interferes with public health and public safety.  McKinsey's conduct has produced a permanent or long-lasting effect, and McKinsey knows its conduct has a significant effect upon the public right.

188.    The public nuisance is substantial and unreasonable.  McKinsey's actions caused and continue to cause the public health epidemic described above and that harm outweighs any offsetting benefit.

189.    McKinsey knew and should have known that its promotion of opioids was false and misleading and that its deceptive marketing scheme and other unlawful, unfair, and fraudulent actions would create or assist in the creation of the public nuisance—the opioid epidemic.

190.    McKinsey's actions were, at the very least, a substantial factor in opioids becoming widely available and widely used.  McKinsey's actions were, at the very least, a substantial factor in deceiving doctors and patients about the risks and benefits of opioids for the treatment of chronic pain.  Without McKinsey's actions, opioid use, misuse, abuse, and addiction would not have become so widespread, and the opioid epidemic that now exists would have been averted or much less severe.

191.    McKinsey has breached its duties to the Tribe by disseminating false and misleading information through Purdue regarding the dangers of opioid use and by targeting physicians likely to prescribe opioids for pain management despite the availability of other, less- or non-addictive pain killers.

192.    Working through Purdue, McKinsey unlawfully provided false or misleading material information about prescription opioids or unlawfully failed to use reasonable care or comply with statutory requirements in the distribution of prescription opioids.

193.    McKinsey's acts and omissions created the opioid epidemic and thereby caused injury to the health of the Tribe and the Tribe's citizens and interfered with the comfortable enjoyment of life and property of others, specifically the Tribe and its citizens.

194.    McKinsey's activities have unreasonably interfered, are interfering, and will interfere with the common rights of the general public:

      a)    To be free from reasonable apprehension of danger to person and property;

      b)    To be free from the spread of disease within the community, including the disease of addiction and other diseases associated with widespread illegal opioid use;

      c)    To be free from the negative health and safety effects of widespread illegal drug sales on premises on and around the Tribe's reservation and communities;

      d)    To be free from blights on the community created by areas of illegal drug use and opioid sales;

      e)    To live or work in a community in which local businesses do not profit from using their premises to sell products that serve the criminal element and foster a secondary market of illegal transactions; and

      f)    To live or work in a community in which community members are not under the influence of narcotics unless they have a legitimate medical need to use them.

195.    McKinsey's acts and omissions offend decency and include the illegal sales of controlled substances.  McKinsey's acts and omissions render the Tribe's citizens insecure.

196.    The Tribe did not consent, expressly or impliedly, to the wrongful conduct of McKinsey.

197.    McKinsey's acts and omissions affect the entire community of the Tribe.

198.    McKinsey's acts and omissions threatened and directly harmed the health and welfare of the Tribe and its citizens.

199.    McKinsey also has a duty to abate the nuisance caused by the prescription opioid epidemic.

200.    The public nuisance created, perpetuated, and maintained by McKinsey can be abated and further recurrence of such harm and inconvenience can be abated.

201.   McKinsey has failed to abate the nuisance they created.

202.   The Tribe seeks an order providing for abatement of the public nuisance that McKinsey created or assisted in the creation of, and enjoining McKinsey from future conduct creating a public nuisance.

203.   The Tribe seeks damages from McKinsey to pay for the costs to permanently eliminate the hazards to public health and safety and abate the public nuisance.

204.   As a direct result of McKinsey's conduct, the Tribe has suffered actual injury and economic damages including, but not limited to, significant expenses for police, emergency, health, education and training, prosecution, child protection, corrections, judicial, and other services.

205.   McKinsey is liable to the Tribe for the costs borne by the Tribe as a result of the opioid epidemic and for the costs of abating the nuisance created by McKinsey.

206.   McKinsey's interference with these public rights has been, is, and will continue to be unreasonable and objectionable because it:

   a)   Has harmed and will continue to harm the public health and public peace of the Tribe;

   b)   Has harmed and will continue to harm the Tribe's neighborhoods and communities by increasing crime, and thereby interfering with the rights of the community at large;

   c)   Violates statutory and common law duties;

   d)   Is of a continuing nature, and has produced long-lasting effects; and

   e)   Is known to McKinsey that its conduct has a significant effect upon the public rights of the Tribe and its citizens.

207.   In addition, and independently, McKinsey's conduct invades a legally protected interest.  McKinsey's conduct constitutes an unreasonable, intentional, and substantial interference because, *inter alia*, each co-conspirator has conducted a fraudulent campaign to

misrepresent knowingly the safety and efficacy of opioid drugs and to ensure their widespread use for chronic pain.

208.     Because the co-conspirators have marketed and sold prescription opioids in a manner contrary to law and because McKinsey's conduct has unreasonably, intentionally, and substantially interfered with a right common to the general public, McKinsey is liable for public nuisance.

209.     The nuisance has affected the Tribe in that it has undermined, is undermining, and will continue to undermine the public health, quality of life, and safety of the Tribe's citizens.  It has resulted in increased crime and property damage within the Tribe's reservation and communities.  It has resulted in high rates of addiction, overdoses, and dysfunction within the Tribe's families and communities.

210.     The Tribe's resources have been, are being, and will be consumed in efforts to address the opioid epidemic, thereby eliminating available resources which could be used to benefit the Tribe.

211.     McKinsey's actions and omissions annoy, injure, and endanger the comfort, repose, health, and safety of the Tribe, offend decency, and render the Tribe's citizens insecure in their lives and the use of property.

212.     McKinsey's nuisance-causing activities are not outweighed by their utility.  In fact, these activities are illegal and have no social utility whatsoever.  There is no legitimately recognized societal interest in marketing and selling prescription opioids through false and misleading representations.

213.     As a direct and proximate result of the nuisance caused by McKinsey and others, the Tribe's citizens have been injured in their ability to enjoy rights common to the public.

214.    As a direct and proximate result of the nuisance, the Tribe has sustained economic harm by spending substantial sums on the societal harms caused by McKinsey's nuisance-causing activity, including costs to the healthcare, criminal justice, social services, welfare, and education systems.

215.    The Tribe has suffered special injury different in kind from the general public because American Indian populations are more vulnerable to opioid abuse and the damage caused by the nuisance has inflicted harm on the very fabric of the Tribe's culture as well as threatened its continued existence as a sovereign nation.

216.    The Tribe has also suffered unique harms of a kind that are different from its citizens at large, namely, that the Tribe has been harmed in its proprietary interests.

## COUNT VI
## NEGLIGENCE AND NEGLIGENCE PER SE

217.    The Tribe realleges and incorporates by reference the foregoing allegations as if set forth at length herein.

218.    The opioid epidemic was a direct, legal, and proximate result of McKinsey's negligence.  As a direct, proximate, and legal result of said negligence, the Tribe suffered damages as alleged herein.

219.    McKinsey, through its work with Purdue and other opioid manufacturers, owed the Tribe a duty to not expose the Tribe to an unreasonable risk of harm.

220.    McKinsey had a legal duty to exercise reasonable and ordinary care and skill in accordance with applicable standards of conduct in its work relating to the marketing, selling, and/or distributing of opioids.

221.    McKinsey breached its duty to the Tribe by, *inter alia*, advising Purdue and other opioid manufacturers to implement sales and marketing strategies designed to increase sales of OxyContin.

222.    McKinsey breached its duty to the Tribe by working with Purdue and other opioid manufacturers to deceptively market opioids, including minimizing the risks of addiction and overdose and exaggerating the purported benefits of long-term use of opioids for the treatment of chronic pain.

223.    It was reasonably foreseeable that McKinsey's actions and omissions would result in the harm to the Tribe described herein.

224.    McKinsey's failure to comply with its duties of care proximately caused damage to the Tribe.

225.    The negligence of McKinsey was a substantial factor in causing the Tribe's damages.  But for McKinsey's services, Purdue and other opioid manufacturers would not have been able to increase sales in the years following the 2007 guilty plea, including the five years under the Corporate Integrity Agreement and the years since its expiration.

226.    As a further direct and proximate result of McKinsey's negligence, the Tribe suffered damages including, but not limited to, economic loss, business loss, emotional distress, annoyance, disturbance, shame, inconvenience, drug addiction and/or dependency, and NAS.

227.    There is moral blame attached to McKinsey because of the terrible injuries and suffering their misconduct caused, including the damage to the Tribe.

228.    Public policy supports finding a duty of care in this circumstance, and a finding of a duty of care on McKinsey will also deter McKinsey from engaging in such behavior in the future.

229.     Further, the conduct alleged against McKinsey in this Complaint was despicable and subjected the Tribe to cruel and unjust hardship in conscious disregard of its rights, constituting oppression, for which McKinsey must be punished by punitive and exemplary damages in an amount according to proof.  McKinsey's conduct evidences a conscious disregard for the safety and welfare of others, including the Tribe and its citizens.  McKinsey's conduct was and is outrageous, done with malice, and evidenced reckless indifference to the interests of the Tribe.  An officer, director, or managing agent of McKinsey personally committed, authorized, and/or ratified the outrageous and wrongful conduct alleged in this Complaint.

230.     The Tribe is without fault, and the injuries to the Tribe would not have happened in the ordinary course of events if McKinsey had used due care commensurate to the dangers involved in the distribution and dispensing of controlled substances.

231.     The Tribe is entitled to an award of punitive damages sufficient to punish and make an example of McKinsey.

## COUNT VII
## VIOLATION OF OREGON UNLAWFUL TRADE PRACTICES ACT
### (O.R.S. §§ 646.605 TO 656)

232.     The Tribe incorporates by reference the preceding paragraphs as if fully set forth herein, and further alleges as follows:

233.     McKinsey has violated the Oregon Unlawful Trade Practices Act, O.R.S. §§ 646.605 to 656, by committing unfair or deceptive trade practices.

234.     McKinsey, in the regular course of its trade, has knowingly made false or misleading statements in connection with the sale of prescription opioids.  Such statements may have, tended to, and/or did deceive or mislead others.  N.M. Stat. Ann. §§ 57-12-2(D).

235.    McKinsey caused false representations to be made that prescription opioids have characteristics, uses, and/or benefits that they do not have.  O.R.S. § 646.608(1)(e).

236.    McKinsey caused false representations to be made that prescription opioids were safe and effective.  O.R.S. § 646.608(1)(g).

237.    McKinsey caused the marketing and sale of prescription opioids in a manner that deceived or tended to deceive by (a) using exaggeration, innuendo, or ambiguity as to material facts, or (b) failing to state material facts regarding the safety and efficacy of these drugs.

238.    By reason of these deceptive acts and/or practices, and these unconscionable acts, the Tribe and its citizens were injured.

239.    At times, places, and involving participants known exclusively to McKinsey and other parties and concealed from the Tribe, McKinsey has engaged in unlawful, unfair, and fraudulent business practices in violation of the Oregon Unlawful Trade Practices Act as set forth above.  McKinsey's business practices as described in this Complaint are deceptive and violate the Oregon Unlawful Trade Practices Act because the practices are likely to deceive consumers in Oregon.

240.    McKinsey knew and should have known at the time of making or disseminating these statements, or causing these statements to be made or disseminated, that such statements were false and misleading and therefore likely to deceive the public.

241.    McKinsey's omissions, which are deceptive and misleading, render even McKinsey's seemingly truthful statements about opioids false and misleading.  All this conduct, separately and collectively, was likely to deceive the Tribe.

242.    McKinsey's business practices as described in this Complaint are unlawful and violate the Oregon Unlawful Trade Practices Act.

243.    These unlawful practices include, but are not limited to:

a)      Through Purdue, McKinsey represented that opioids had sponsorship, approval, characteristics, ingredients, uses, or benefits which they did not have in violation of Oregon Unlawful Trade Practices Act;

b)      Through Purdue, McKinsey represented that opioids were of a particular standard, quality, or grade when they were of another in violation of Oregon Unlawful Trade Practices Act;

c)      McKinsey failed to identify and report suspicious prescribing to law enforcement and health authorities; and

d)      Through Purdue and other manufacturers of opioids, McKinsey made or disseminated, directly or indirectly, untrue, false, or misleading statements about the use of opioids to treat chronic pain, or causing untrue, false, or misleading statements about opioids to be made or disseminated to the general public in violation of Oregon Unlawful Trade Practices Act.

244.    McKinsey's business practices as described in this Complaint are unfair and violate the Oregon Unlawful Trade Practices Act because they offend established public policy, and because the harm they cause to the Tribe and its citizens greatly outweighs any benefits associated with those practices.

245.    As a direct and proximate result of the foregoing acts and practices, McKinsey has received, or will receive, income, profits, and other benefits, which they would not have received if they had not engaged in the violations of the Oregon Unlawful Trade Practices Act described in this Complaint.

246.    As a direct and proximate result of the foregoing acts and practices, McKinsey has obtained an unfair advantage over similar businesses that have not engaged in such practices.

## COUNT VIII
## CIVIL CONSPIRACY

247.    The Tribe incorporates by reference the preceding paragraphs as if fully set forth herein, and further alleges as follows:

248.    Purdue, other manufacturers of opioids, and McKinsey engaged, and continue to engage, in a massive marketing campaign to misstate and conceal the risks of treating long-term chronic, non-acute, and non-cancer pain with opioids as described in this Complaint.  Their aggressive marketing campaign enabled them to overcome the longstanding medical consensus that opioids were unsafe for the treatment of chronic pain and resulted in a significant increase in the number of opioids prescribed nationwide and in Oregon.

249.    For example, McKinsey and Purdue agreed to collaborate for years to market and sell opioids through misleading and unlawful acts.  McKinsey and Purdue engaged in unfair trade practices as described in this Complaint.

250.    Without Purdue, other manufacturers of opioids, and McKinsey's misrepresentations, which created demand, they would not have been able to sell the increasing quantity of prescription opioids for non-medical or inappropriate purposes.

251.    None of the opioid manufacturers or McKinsey would have succeeded in profiting so much from the opioid epidemic without the concerted conduct of the other parties.

252.    Purdue, other manufacturers of opioids, and McKinsey agreed with each other to accomplish the unlawful purposes of marketing, selling, and distributing prescription opioids through violations of law and misrepresentations.

253.    Purdue, other manufacturers of opioids, and McKinsey performed numerous overt acts in furtherance of this conspiracy, including marketing, selling, and distributing prescription opioids by means of misrepresentations and omissions, violating federal and state laws, and turning a blind eye to diversion of prescription opioids.

254.    As a result of the concerted action between Purdue, other manufacturers of opioids, and McKinsey, the Tribe and its citizens have suffered damages.

255.    Purdue, other manufacturers of opioids, and McKinsey are jointly and severally liable for the results of their concerted efforts.

## COUNT IX
## UNJUST ENRICHMENT

256.    The Tribe incorporates by reference the preceding paragraphs as if fully set forth herein, and further alleges as follows:

257.    As an expected and intended result of its conscious wrongdoing as set forth in this Complaint, McKinsey has profited and benefited from the increase in the distribution and purchase of opioids within the Tribe's communities, including from opioids foreseeably and deliberately diverted within and into the Tribe's communities.

258.    The Tribe has expended substantial amounts of money to fix or mitigate the societal harms caused by McKinsey's conduct.

259.    The Tribe has conferred a benefit upon McKinsey by paying for what may be called McKinsey's externalities—the costs of the harm caused by McKinsey's negligent or otherwise unlawful distribution and sales practices.

260.    McKinsey is aware of this obvious benefit, and that retention of this benefit is unjust.

261.    The Tribe has paid for the cost of McKinsey's externalities, and McKinsey has benefitted from those payments because they allowed McKinsey to continue providing customers with a high volume of opioid products.  Because of their deceptive marketing of prescription opioids, McKinsey obtained enrichment they would not otherwise have obtained. Because of their conscious failure to exercise due diligence in preventing diversion, McKinsey obtained enrichment it would not otherwise have obtained.  The enrichment was without justification, and the Tribe lacks a remedy provided by law.

262.    McKinsey made substantial profits while fueling the opioid epidemic in the Tribe's communities.

263.    McKinsey has been unjustly enriched by its negligent, intentional, malicious, oppressive, illegal, and unethical acts, omissions, and wrongdoing.

264.    It would be inequitable to allow McKinsey to retain benefit or financial advantage.

265.    McKinsey's misconduct alleged in this case has caused ongoing and persistent harm to the Tribe.

266.    The Tribe demands judgment against McKinsey for restitution, disgorgement, and any other relief allowed in law or equity.

## PRAYER FOR RELIEF

WHEREFORE, the Tribe prays that the Court:

FOR THE RICO COUNTS I–IV:

The Tribe seeks all legal and equitable relief as allowed by law, including actual damages; treble damages; equitable and/or injunctive relief in the form of court-supervised corrective communication, actions, and programs; forfeiture as deemed proper by the Court; attorneys' fees; all costs and expenses of suit; and pre- and post-judgment interest, and including, *inter alia*:

a)    Actual damages and treble damages, including pre-suit and post-judgment interest;

b)    An order enjoining any further violations of RICO;

c)    An order enjoining any further violations of any statutes alleged to have been violated in this Complaint;

d)    An order enjoining the commission of any tortious conduct, as alleged in this Complaint;

58

e)    An order enjoining any future marketing or misrepresentations regarding the health benefits or risks of prescription opioids use, except as specifically approved by the FDA;

f)    An order enjoining any future marketing of opioids through non-branded marketing including through front groups, KOLs, websites, or in any other manner alleged in this Complaint that deviates from the manner or method in which such marketing has been approved by the FDA;

g)    An order enjoining any future marketing to vulnerable populations, including, but not limited to, persons over the age of fifty-five, anyone under the age of twenty-one, and veterans;

h)    An order requiring McKinsey to publicly disclose all documents, communications, records, data, information, research, or studies related to its work with Purdue and other manufacturers of opioids;

i)    An order divesting McKinsey of any interest in, and the proceeds of, any work related to opioids;

j)    Forfeiture as deemed appropriate by the Court; and

k)    Attorneys' fees and all costs and expenses of suit.

FOR COUNTS V–IX:

a)    Enter judgment against McKinsey and in favor of the Tribe;

b)    Award compensatory damages in an amount sufficient to compensate the Tribe fairly and completely for all damages, treble damages, pre-judgment and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate;

c)    Award damages caused by the opioid epidemic, including but not limited to, (i) costs for providing medical care, additional therapeutic and prescription drug purchases including costs of obtaining naloxone and suboxone, as well as other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths; (ii) costs for providing culturally-informed treatment, counseling, education, and rehabilitation services; (iii) costs for providing treatment of infants born with opioid-related medical conditions, including NAS; (iv) costs for providing care for children whose parents suffer from opioid-related disability or incapacitation; (v) costs associated with social services, criminal justice, and rehabilitation relating to the opioid epidemic; and (vi) costs for providing transitional housing for those returning to the community;

59

d)     Enter orders and procedures to abate the nuisance created by McKinsey's wrongful conduct;

e)     Enjoin McKinsey from continuing or repeating the wrongful conduct alleged herein and from the publication and/or dissemination of false and misleading materials directly or indirectly;

f)     Award the Tribe its costs of suit, including reasonable attorneys' fees as provided by law;

g)     Award such further and additional relief as the Court may deem just and proper under the circumstances; and

h)     Grant the Tribe the right to amend its pleading to conform to the evidence produced at trial.

## **JURY DEMAND**

The Tribe respectfully requests that all issues presented by its above Complaint be tried by a jury, with the exception of those issues that, by law, must be tried before the Court.

Date:  November 16, 2021

*/s/ Jenna A. Hudson*
Richard J. Leveridge, *admitted pro hac vice*
Jenna A. Hudson, *admitted pro hac vice*
Michael B. Rush, *admitted pro hac vice*
GILBERT LLP
700 Pennsylvania Avenue, SE, Suite 400
Washington, DC 20003
leveridger@gilbertlegal.com
hudsonj@gilbertlegal.com
rushm@gilbertlegal.com

Kim D'Aquila (State Bar No. 180987)
Assistant Tribal Attorney
CONFEDERATED TRIBES OF THE
GRAND RONDE COMMUNITY OF
OREGON
9615 Grand Ronde Road
Grand Ronde, Oregon 97347
kim.daquila@grandronde.org

Lloyd B. Miller, *admitted pro hac vice*
Donald J. Simon, *admitted pro hac vice*
Whitney A. Leonard, *admitted pro hac vice*
SONOSKY CHAMBERS SACHSE
ENDRESON & PERRY, LLP

1425 K Street, NW, Suite 600
Washington, DC 20005
lloyd@sonosky.net
dsimon@sonosky.com
whitney@sonosky.net

Richard W. Fields, *pro hac vice motion pending*
Martin F. Cunniff, *pro hac vice motion pending*
FIELDS PLLC
1701 Pennsylvania Avenue, NW, Suite 200
Washington, DC 20006
fields@fieldslawpllc.com
martincunniff@fieldslawpllc.com

*Attorneys for Plaintiff*